**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------------X
In re Ex Parte Application of CI INVESTMENTS INC.,
ACTING IN ITS CAPACITY AS MANAGER AND
TRUSTEE FOR AND ON BEHALF OF FIRST ASSET
MORNINGSTAR INTERNATIONAL VALUE INDEX ETF;
LIGHTHOUSE INVESTMENT PARTNERS LLC; THE
CHURCH OF ENGLAND PENSIONS BOARD, AS
TRUSTEE OF THE CHURCH ADMINISTRATORS
PENSION FUND; and STICHTING
BEDRIJFSTAKPENSIOENFONDS VOOR DE MEDIA
PNO for an order Pursuant to 28 U.S.C. § 1782.
----------------------------------------------------------------------------X

23 Misc. 434 (GHW) (GS)

OPINION & ORDER[1]

**GARY STEIN, United States Magistrate Judge:**

Applicants, who are parties to pending civil lawsuits against Danske Bank A/S in Denmark, have submitted an *ex parte* application for judicial assistance pursuant to 28 U.S.C. § 1782 seeking to serve discovery subpoenas on Deutsche Bank entities in the United States. For the reasons, and with the caveats, set forth below, the *ex parte* application is **GRANTED** without prejudice to the Deutsche Bank entities' rights to move to quash or modify the subpoenas.

---

[1] Until somewhat recently, this Court "has treated applications made pursuant to 28 U.S.C. § 1782 as non-dispositive motions that Magistrate Judges have the authority to hear and determine by order, on referral, pursuant to 28 U.S.C. § 636(b)(1)(A) and Fed. R. Civ. P. 72." *Athene Holding Ltd.*, No. 23 Misc. 171 (JHR) (SLC), 2023 WL 5348950, at n.1 (S.D.N.Y. Aug. 21, 2023) (collecting cases). However, the Second Circuit, in a non-binding summary order, explained that a Magistrate Judge's order denying a Section 1782 application and closing the miscellaneous case, following receipt and consideration of objections from the party to be subpoenaed, was an unreviewable "nonfinal order" in the absence of district court action. *Associacao dos Profissionais dos Correios v. Bank of N.Y. Mellon Corp.*, No. 22-2865, 2023 WL 3166357, at *1 (2d Cir. Mar. 28, 2023) (summary order). The Second Circuit remanded the order to the district court so that it could be "treated as a report and recommendation and appropriate proceedings can be held." *Id.* Here, because the Court grants the application solely on an *ex parte* basis while ordering Applicants to meet and confer with the subpoenaed parties and report back to the Court, "this ruling is thus neither final nor dispositive, such that an Opinion & Order, as opposed to a Report & Recommendation, is appropriate." *Athene*, 2023 WL 5348950, at n.1.

## BACKGROUND[2]

Applicants are CI Investments Inc., acting in its capacity as manager and trustee for and on behalf of First Asset Morningstar International Value Index ETF ("CI"); Lighthouse Investment Partners LLC ("LIP"); The Church of England Pensions Board, as Trustee for The Church Administrators Pension Fund ("the Church"); and Stichting Bedrijfstakpensioenfonds voor de Media PNO ("Stichting"). Applicants are investors in securities issued by Danske Bank A/S ("Danske Bank" or "Danske") and listed primarily on the NASDAQ stock exchange in Copenhagen. (Noer Decl. ¶ 9).

Applicants aver that Danske's branch in Estonia ("Danske Estonia") was the conduit for "one of the largest money laundering scandals in recent history." (*Id.* ¶ 4). According to an independent investigation commissioned by Danske's board of directors, from 2007 through 2015, an "astronomical" sum of $234 billion flowed through customer bank accounts located at Danske Estonia. (Noer Decl. ¶ 4 & Exh. 1 at 5-10). The report of the independent investigation concluded, *inter alia*, that anti-money laundering ("AML") procedures at Danske Estonia were "manifestly insufficient and inadequate" and that this was known at the "Danske Bank Group" (*i.e.*, Danske Estonia's parent) level by early 2014. (*Id.* ¶ 5).

When the money laundering scandal was publicly disclosed in September 2018, the value of Danske's stock plummeted by over $12.8 billion. (*Id.* ¶ 6).

---

[2] The relevant facts are taken from (1) the Declaration of Alice Y. Cho, Esq. ("Cho Decl."), a member of the Applicants' U.S. legal team, and the exhibits thereto (Dkt. No. 9); and (2) the Declaration of Lotte Noer, Esq. ("Noer Decl."), the Applicants' Danish counsel, and the exhibits attached thereto. (Dkt. No. 10).

Applicants suffered "significant losses" when "the truth about Danske Bank's money laundering fraud came out." (*Id.* ¶ 9).

From March 2019 to February 2021, over 300 institutional investors filed securities fraud claims against Danske in the City Court of Copenhagen ("City Court").[3] (*Id.* ¶ 8). In the aggregate, the claimants in these actions (the "Danish Actions") seek about $1 billion in damages. (*Id.*). Applicants are among the institutional investors who have filed claims. (*Id.*).

As the number of aggrieved investor-claimants mushroomed, the City Court referred 196 of the 300-plus pending cases to the Eastern High Court of Denmark ("High Court") for further adjudication. (*Id.* ¶ 11). Subsequently, the High Court selected eight test cases (the "Test Cases") to proceed while the remaining cases before the City Court and the High Court were stayed pending resolution of the Test Cases. (*Id.* ¶ 12). Applicants CI and LIP are claimants in the Test Cases.[4] (*Id.*).

Central to the Applicants' legal theory in the Danish Actions is the assertion that Danske's top management had knowledge of Danske Estonia's money laundering activities, yet "engaged in a years-long cover up to keep the truth from financial regulators in Estonia and Denmark, and from its investors." (*Id.* ¶ 10; *see id.* ¶ 14). Through this application, Applicants seek to obtain evidence from two

---

[3] Specifically, these claims are brought pursuant to the Danish Securities Trading Act and the European Union's Market Abuse Regulation. (*Id.* ¶ 13).

[4] While Applicants' papers do not explicitly so state, the Court assumes that Applicants Stichting and the Church are claimants in cases which have been stayed.

Deutsche Bank entities in the U.S.—Deutsche Bank AG's New York Branch ("Deutsche NY") and Deutsche Bank Trust Co. of the Americas ("Deutsche Trust") (together, the "Deutsche Bank U.S. Entities")—that Applicants submit will help them prove Danske's knowledge, wrongdoing, and liability in the Danish Actions. (*Id.* ¶¶ 18, 20, 22).

In December 2022, Danske pled guilty, pursuant to a plea agreement with the U.S. Department of Justice, to conspiracy to defraud U.S. banks regarding Danske Estonia's customers and AML controls, and agreed to (1) pay fines of over $2 billion to U.S. and Danish authorities and (2) implement a compliance program and AML controls. (Cho Decl. ¶¶ 11-13 & Exhs. B, D). The plea agreement states that customers of Danske Estonia conducted significant transactions using U.S. dollar accounts that Danske Estonia maintained at various banks in the Southern District of New York, one of which, according to Applicants, was Deutsche Bank. (*Id.* ¶ 14 & Exh. B).

On July 6, 2020, the New York State Department of Financial Services ("DFS") entered into a consent order (the "Consent Order") with Deutsche Bank AG, and the Deutsche Bank U.S. Entities (collectively, "Deutsche Bank"). (Cho Decl. ¶ 3 & Exh. A). In the Consent Order, DFS found that Deutsche Bank conducted business in an unsafe and unsound manner and failed to maintain an effective AML compliance program, in violation of New York law, and imposed a $150 million fine. (*Id.* Exh. A at ¶¶ 112-14).

The Consent Order stems from DFS's investigation of Deutsche Bank's relationship with three different customers: Jeffrey Epstein, the Federal Bank of the Middle East, and Danske Estonia. (*See generally id.* Exh. A and ¶¶ 7, 109). As described by Applicants, the Consent Order refers to Deutsche Bank's "knowledge and concerns" about "extensive money laundering" at Danske Estonia and its failure to act despite identifying 340 suspicious transactions between 2007 and 2015 through Danske Estonia's U.S. dollar correspondent accounts at Deutsche Bank. (*Id.* ¶ 3).

A month after the Consent Order was announced, on August 7, 2020, Applicants' counsel submitted a request to DFS under New York's Freedom of Information Law ("FOIL"). Applicants sought "[a]ll documents . . . related to the consent order entered into between the agency and [Deutsche Bank] on July 6, 2020" and requested DFS to "prioritize all documents specifically related to the agency's investigation of [Deutsche Bank's] involvement with [Danske Estonia]." (Cho Decl. ¶ 6). DFS denied Applicants' FOIL request. (*Id.* ¶¶ 7-9). Applicants sought judicial review from the Supreme Court of the State of New York, which denied Applicants' Article 78 petition on November 9, 2023. (*Id.* ¶ 10).

Applicants filed the instant application the very next day. (Dkt. No. 1). The application seeks permission to serve substantially identical document and Fed. R. Civ. P. 30(b)(6) deposition subpoenas on the Deutsche Bank U.S. Entities. The document subpoenas demand "[a]ll documents concerning or reflecting all communications" between Deutsche Bank and Danske Estonia with respect to

5

suspicious transactions and AML alerts. (Cho Decl. Exhs. J & K). These subpoenas also seek to compel production of "[a]ll documents" related to DFS's investigation of Deutsche Bank's involvement with Danske Estonia. (*Id.*).[5]

The deposition subpoenas cover six interrelated topics.[6] (*Id.* Exhs. H & I). These include the Deutsche Bank U.S. Entities' knowledge of "suspicious transactions" and the "high volume of AML alerts" relating to Danske Estonia, as well as communications with Deutsche Bank Estonia personnel regarding certain AML issues and communications with Deutsche Bank AG personnel regarding law enforcement inquiries into Danske Estonia's customers. (*Id.*).[7]

## DISCUSSION

### A.   Legal Standards

Under 28 U.S.C. § 1782,

> [t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . The order may be made . . . upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

---

[5] This request is worded slightly differently in the two subpoenas. The subpoena directed to Deutsche Bank NY seeks all documents, "including complete files and all information received from third parties, related to" the investigation. (*Id.* Exh. J at 10). The subpoena directed to Deutsche Trust seeks all documents, "including complete files and all information produced to [DFS], regarding" the investigation. (*Id.* at Exh. K at 10).

[6] The Court notes that all four of the deposition and document subpoenas mistakenly identify the relevant parties as Stichting and QIC Ltd. (*See* Cho Decl. Exhs. H, I, J, & K). Prior to the issuance of these subpoenas, Applicants' counsel is directed to update them to reflect the proper parties seeking discovery.

[7] On September 29, 2023, another claimant in the Danish Actions—represented by the same counsel that represents Applicants here—submitted a nearly identical application before Judge Kaplan. *QIC Ltd. v. Deutsche Bank AG New York Branch*, 23 Misc. 355 (LAK) (Dkt. No. 1). On October 4, 2023, Judge Kaplan granted QIC Ltd.'s application in a short order. *See id.* (Dkt. No. 8).

As a threshold matter, a district court may not grant an application pursuant to Section 1782 unless three statutory requirements are met: "(1) the person from whom discovery is sought resides or is found within the district; (2) the discovery is for use in a proceeding before a foreign tribunal; and (3) the application is made by a foreign or international tribunal or any interested person." *Kiobel by Samkalden v. Cravath, Swaine & Moore, LLP*, 895 F.3d 238, 243 (2d Cir. 2018) (cleaned up); *accord, e.g., Fed. Republic of Nigeria v. VR Advisory Servs.*, 27 F.4th 136, 148 (2d Cir. 2022); *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015).

If the requisite statutory requirements are met, district courts will then exercise their discretion to determine whether the sought-after discovery should be permitted. *In re Ulmans*, No. 23 Misc. 23 (GHW) (VF), 2023 WL 3853703, at *3 (S.D.N.Y. Apr. 20, 2023), *report and recommendation adopted by* 2023 WL 3412769 (S.D.N.Y. May 12, 2023) (citations omitted). In *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), the Supreme Court identified four factors for district courts to consider in conducting this analysis. These factors, known as the *Intel* factors, are: "(1) whether the person from whom the discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the Section 1782 application contains unduly intrusive or

burdensome discovery requests." *Ulmans*, 2023 WL 3853703, at *3 (citing *Intel*, 542 U.S. at 264-65).

Although district courts should consider the *Intel* factors as a "useful guide," courts in this Circuit have clarified that they are neither exhaustive nor dispositive. *In re CBRE Glob. Invs. (NL) B.V.*, No. 20 Misc. 315 (VEC), 2021 WL 2894721, at *9 (S.D.N.Y. July 9, 2021) ("no single *Intel* factor is alone dispositive" and "the *Intel* factors are not to be applied mechanically . . . [a] district court should also take into account any other pertinent issues arising from the facts of the particular dispute") (cleaned up); *see also, e.g.*, *Frasers Grp. PLC v. Gorman*, No. 23 Misc. 348 (PAE), 2023 WL 6938284, at *3-4 (S.D.N.Y. Oct. 19, 2023) (relying on the "apex witness doctrine" to deny a Section 1782 application in addition to considering the *Intel* factors).  District courts should also exercise their discretion in light of Section 1782's "twin aims," which are: (1) "providing efficient assistance to participants in international litigation" and (2) "encouraging foreign countries by example to provide similar means of assistance to our courts." *Intel*, 542 U.S. at 252.

Finally, although the Deutsche Bank U.S. Entities are not currently parties to this case, "it is neither uncommon nor improper for district courts to grant applications made pursuant to §1782 *ex parte*." *Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) (citing examples); *see also In re Tethyan Copper Co. Pty. Ltd.*, No. 21 Misc. 377 (AT), 2022 WL 1266314, at *1 (S.D.N.Y. Apr. 28, 2022) ("Courts routinely grant such petitions *ex parte*.") (citing *Gushlak*, 486 F. App'x at 217).  This procedure does not violate the due process rights of the subpoenaed

8

party because that party "'can later challenge any discovery request by moving to quash pursuant to Federal Rule of Civil Procedure 45(c)(3).'" *In re Abraaj Inv. Mgmt. Ltd.*, No. 20 Misc. 229, 2023 WL 2674752, at *2 (S.D.N.Y. Mar. 29, 2023) (quoting *Gushlak*, 486 F. App'x at 217).

## B. The Application Satisfies Both the Statutory and Discretionary Factors

### 1. Statutory Factors

Applicants have satisfied each of the three statutory factors under Section 1782. First, the four subpoenas attached to the application identify both Deutsche Bank U.S. Entities as being located at 60 Wall St., New York, NY 10005, an address located within this District. (Cho Decl. ¶¶ 4-5 & Exhs. H, I, J, & K). The first factor is thus satisfied.

The second statutory factor requires the discovery sought to be "for use" in a foreign proceeding. *See Mees*, 793 F.3d at 298-301 (elaborating on the "for use" requirement). This factor warrants more discussion than the preceding and subsequent factors. On the one hand, CI and LIP are in active, ongoing litigation in Denmark as part of the Test Cases before the High Court. (Noer Decl. ¶ 12). Thus, CI and LIP certainly meet the "for use" requirement.

On the other hand, the Church and Stichting are parties to litigation which has been stayed pending decisions in the Test Cases. Though these two Applicants are presumably not actively litigating the Test Cases, counsel states that their cases "will resume after the High Court reaches a decision on [the Test Cases]." (*Id.* ¶ 12). At that point, any evidence gathered through this proceeding can be used

9

by the Church and Stichting. This is sufficient to meet the "for use" statutory requirement. *See Mees*, 793 F.3d at 299 (holding that the "for use" requirement can be satisfied "even where a foreign proceeding has not yet begun," so long as "it is 'within reasonable contemplation'") (quoting *Intel*, 542 U.S. at 259); *In re Niedbalski*, No. 21 Misc. 747 (JGK), 2023 WL 4399003, at *2-3 (S.D.N.Y. July 7, 2023) (requirement met despite "slow progression" of foreign proceeding and fact that applicant initially filed the same only to stay the limitations period).

As for the third statutory requirement, Applicants are undoubtedly "interested person[s]" for purposes of Section 1782 due to their status as claimants in the Danish Actions. *See Intel*, 542 U.S. at 256 (there is "[n]o doubt litigants are included among . . . the 'interested person[s]' who may invoke [Section] 1782); *Matter of Degens*, No. 20 Misc. 237 (JGK) (RWL), 2020 WL 4252725, at *4 (S.D.N.Y. July 24, 2020) (finding the third factor "easily met" by a party to an ongoing matrimonial dispute in Brazil). The last statutory factor is therefore satisfied.

2. **Discretionary Factors**

Under the first *Intel* factor, courts consider whether the target of an applicant's discovery request is a participant in the relevant foreign proceeding. "[W]hen the person from whom discovery is sought is a participant . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264. Here, Applicants seek discovery from the Deutsche Bank U.S. Entities, which are not

parties to any of the Danish Actions, in which Danske is the "sole defendant." (Noer Decl. ¶ 27). Thus, the first *Intel* factor weighs in favor of granting the application.

The second *Intel* factor instructs district courts to consider "the nature of the foreign tribunal, the character of the proceeding underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264. "'Absent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance,'" and courts "should deny discovery on the basis of a lack of receptiveness only where it is provided with 'authoritative proof that the foreign tribunal would reject evidence obtained with the aid of [S]ection 1782.'" *In re Atvos Agroindustrial Investimentos S.A.*, 481 F. Supp. 3d 166, 176-77 (S.D.N.Y. 2020) (quoting *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100-02 (2d Cir. 1995)).

Because Applicants bring their application *ex parte*, there is no evidence before the Court that the Danish courts would reject assistance from a federal district court. To the contrary, Applicants provide the Court with ample affirmative evidence of a pattern of mutual legal assistance between Denmark and the United States. (Cho Decl. ¶ 23 & Exhs. L, M (citing cases noting Danish courts' receptivity to U.S. judicial assistance); Noer Decl. ¶¶ 32-4 & Exhs. 18-20). Thus, Applicants have made a sufficient showing of the Danish courts' general receptivity to assistance from U.S. courts. As a result, the second *Intel* factor weighs in favor of granting the Applicants' application.

11

The third *Intel* factor seeks to flush out "attempt[s] to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. This does not require the applicant to have first sought the requested discovery in the foreign tribunal; "'[c]ourts may grant [Section] 1782 applications even where the applicant did not first seek discovery in the foreign tribunal . . . or where the information sought was not discoverable under the laws of the foreign country at issue in the foreign proceeding.'" *In re Batbold*, No. 21 Misc. 218 (RA) (OTW), 2021 WL 4596536, at *4 (S.D.N.Y. Oct. 6, 2021) (quoting *In re Paribas Jersey Tr. Corp.*, No. 18 Misc. 47 (PAC), 2018 WL 895675, at *3 (S.D.N.Y. Feb. 14, 2018)); *see also Azima v. Handjani*, No. 21 Misc. 501 (PGG), 2022 WL 2788400, at *7 (S.D.N.Y. July 15, 2022) (third *Intel* factor favored granting application where no showing that evidence sought "is within the jurisdictional reach of the [foreign] court, or that [applicant] seeks discovery here in bad faith").

Here, there is no indication Applicants are attempting to circumvent prohibitions on discovery in Denmark. Their Danish counsel represents that the Danish courts have no jurisdiction to compel the Deutsche Bank U.S. Entities to produce evidence for the Danish Actions. (Noer Decl. ¶ 27). Further, Applicants have attempted to obtain discovery in the Danish Actions from Danske itself pertaining to Danske's knowledge of the alleged money laundering at Danske Estonia, but, according to Applicants, Danske has refused to comply with the Danish courts' discovery orders. (*Id.* ¶¶ 22-24).[8] Only after pursuing this evidence

---

[8] According to Applicants' Danish counsel, under Danish procedural law, a party may elect to not comply with a discovery order. Unlike in the United States where such a choice could lead to (*inter*

12

for a considerable amount of time did Applicants submit this application.  For this reason, the third *Intel* factor also favors applicants.

The fourth *Intel* factor considers whether discovery requests are "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265.  "[A] district court evaluating a [Section] 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." *Mees*, 793 F.3d at 302.  Consequently, the applicant's discovery requests should be "tailored to seek information relevant to the parties' claims and defenses and proportional to the needs of the case." *Athene Holding Ltd. v. Dang*, No. 23 Misc. 171 (JHR) (SLC), 2023 WL 5348950, at *3 (S.D.N.Y. Aug. 21, 2023) (citation omitted).  The proportionality analysis "depends on the relevance of the information sought—and, in the case of a § 1782 petition, relevance is assessed with regard to the foreign proceeding." *Id.* (citation omitted). Under the fourth factor, a district court may "limit the scope" of the requested discovery.  *In re Tel. Media Grp. Ltd.*, No. 23 Misc. 215 (JGLC), 2023 WL 5770115, at *11 (S.D.N.Y. Sep. 6, 2023).

Having reviewed the subpoenas and the factual context surrounding the desired discovery, the Court has serious misgivings about the relevance and proportionality of Applicants' requests.  In particular, the request for "[a]ll documents . . . related to" DFS's investigation of Deutsche Bank's involvement with

---

*alia*) contempt sanctions or a judgment of default, *see* Fed. R. Civ. P. 37(b)(2), the sole sanction available to a Danish court is to draw an "adverse inference" against the non-complying party.  (Noer Decl. ¶¶ 16, 24-25).

Danske Estonia appears on its face to sweep up a variety of documents that bear no conceivable relevance to the Danish Actions. (*See* Cho Decl. Exhs. J & K). Communications between DFS and Deutsche Bank (including, by way of example, emails concerning compliance with DFS's document demands and drafts of the Consent Order exchanged between the parties) are documents "related to" the investigation. So are internal Deutsche Bank documents relating to these subjects, press inquiries and coverage relating to the investigation, and doubtless many other documents with no genuine relevance to the Danish Actions. *See, e.g., Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14 Civ. 7126 (JMF), 2016 WL 6779901, at *4 (S.D.N.Y. Nov. 16, 2016) (denying demand for various documents related to government investigations on relevance, proportionality, and overbreadth grounds).

Applicants are likely mainly interested in the subset of documents that Deutsche Bank produced to DFS. (*See* Dkt. No. 8 at 26 (arguing that, "for the most part," the Deutsche Bank U.S. Entities "simply have to recreate the productions they already made to the DFS")). But even if that is what Applicants aim to catch— and as noted they have cast their net far more widely—this request still raises concerns. In general, courts have recognized such "cloned discovery" requests to be problematic, depending on the context. *See, e.g., N.J. Carpenters Health Fund v. DLJ Mortg. Cap., Inc.*, No. 08 Civ. 5653 (PAC), 2012 WL 13135408, at *1 (S.D.N.Y. Mar. 2, 2012) (denying discovery request that says "you gave some documents to the government concerning another investigation, so give them to me"); *In re CenuryLink Sales Prac. & Sec. Litig.*, No. 0:17-02795 (MJD) (KMM), 2020 WL

8256364, at *7 (D. Minn. Oct. 28, 2020) (denying as overbroad demand by plaintiffs in securities fraud action that third party produce documents and information provided to government investigators because it "would likely result in the production of large chunks of information that is irrelevant to this lawsuit while not necessarily producing information that is"); *but see Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2*, No. 18 Civ. 1781 (PGG) (BCM), 2020 WL 9423921, at *2-3 (S.D.N.Y. Aug. 31, 2020) (generally approving cloned discovery demand for documents produced in government investigation while directing parties to meet and confer about possible ways to narrow request).

More specifically, according to a brief filed by DFS in the Article 78 proceeding ("DFS Br."),[9] "Deutsche Bank produced approximately 90,000 pages of confidential materials to the Department in response to investigative demands." (DFS Br. (Preliminary Statement)). Deutsche Bank's production, according to DFS, included sensitive and proprietary trade secret information concerning Deutsche Bank's AML programs and its internal assessment of the flaws or failures in those programs, the disclosure of which could harm the bank as well as the public interest. (*Id.* (Point II)).[10] It is difficult to see how such internal Deutsche Bank documents could be relevant to the Danish Actions and, in particular, to Applicants'

---

[9] Respondents' Memorandum of Law in Opposition to the Petition and in Support of Cross-Motion to Dismiss the Article 78 Petition, *Davenport v. N.Y.S. Dep't of Fin. Servs.*, 2022 WL 21727787 (N.Y. Sup. Ct. Mar. 23, 2022) (unpaginated).

[10] DFS's brief also highlighted the particular importance of confidentiality in the context of money laundering investigations, noting that under federal law, it is illegal to disclose information relating to suspicious activity reports filed by U.S. financial institutions, even when that information has been subpoenaed in the context of discovery in a civil lawsuit. (*See id.* at n.3; 31 C.F.R. § 1020.320(e)(1)).

stated goal of finding evidence bearing on Danske's knowledge of AML issues at its Estonian branch.

Nor is it immediately apparent how proof of Deutsche Bank's knowledge of AML issues at Danske Estonia, or its communications about those issues with Danske Estonia, would help Applicants prove knowledge on the part of Danske Bank executives in Denmark. Applicants do not seek any communications between Deutsche Bank and Danske Bank itself (apparently because there is no reason to believe there were any), and instead argue that "[w]hat was known or knowable (indeed obvious) to Deutsche Bank and communicated by it to [Danske Estonia] was *a fortiori* within Danske's own actual or constructive knowledge." (Noer Decl. ¶ 22). That proposition strikes the Court as a potential but debatable ground for discovery here.

Despite these misgivings in relation to the fourth *Intel* factor, the Court believes that the better course of action is to authorize issuance of the subpoenas, as drafted, for service upon the Deutsche Bank U.S. Entities. On the present record, and without adversarial testing, the Court is not in a position to make informed rulings as to which of Applicants' discovery requests are relevant and proportional to the Danish Actions or as to the extent to which the requests may be unduly broad or burdensome. *See, e.g.*, *In re Nike Shipholding Corp.*, 23 Misc. 221 (ALC) (KHP), 2023 WL 5917196, at *3 (S.D.N.Y. July 31, 2023) (noting that "the Court is not in the best position on an ex parte application [under Section 1782] to determine

16

whether the requests as phrased are overly broad and, in this regard, overly burdensome").

As is true of discovery in general, the parties involved are initially better situated than the Court to analyze issues of relevance and burden and determine precisely how, if at all, to modify the subpoenas. *See* Fed. R. Civ. P. 30(b)(6) (requiring parties to confer in good faith about the matters for examination); Fed. R. Civ. P. 37(a)(1) (requiring parties to meet and confer before raising discovery dispute with court). As a result of a meet-and-confer process, Applicants might choose to voluntarily limit the scope of their discovery requests and attempt to reach an agreement with the Deutsche Bank U.S. Entities as to the discovery to be provided. This could obviate the need for a ruling by the Court, or at least substantially narrow any issues in dispute. *See Nike Shipholding*, 2023 WL 5917196, at *3 (authorizing issuance of subpoenas but ordering the parties to promptly meet and confer to resolve any objections to the subpoenas).

Accordingly, the Court authorizes Applicants to issue the subpoenas but also requires Applicants, prior to the return date, to meet and confer with the Deutsche Bank U.S. Entities to discuss any issues of relevance, proportionality, overbreadth, and burden identified in this Opinion & Order or raised by the Deutsche Bank U.S. Entities. Applicants are also directed to serve a copy of this Opinion & Order on the Deutsche Bank Entities along with the subpoenas. Applicants are further directed to provide the Court, by letter, with a status update by no later than January 19, 2024.

In the meantime, and for the avoidance of doubt, the granting of this *ex parte* application is without prejudice to the rights of the Deutsche Bank U.S. Entities to move to quash or modify the subpoenas in any respect and on any proper ground. *See Ulmans*, 2023 WL 3853703, at *6 (granting *ex parte* application under § 1782 authorizing subpoenas to banks while noting that "a bank served with a subpoena [may] conclude that the requests are unduly burdensome . . . [and] challenge the subpoena by moving to quash under Federal Rule of Civil Procedure 45").

## CONCLUSION

For the reasons stated, and on the conditions set forth herein, Applicants' application pursuant to Section 1782 is **GRANTED**.

DATED:   New York, New York
         December 14, 2023

　　　　　　　　　　　　　　　　　　　　　　　　／s／ Gary Stein
　　　　　　　　　　　　　　　　　　　　　　　　GARY STEIN
　　　　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge